Thank you, Your Honors. Good morning. May it please the Court, my name is Karen Lindholt. I am here on behalf of defendant appellant Mr. Raul Zavala. Mr. Zavala was convicted of possession with intent to distribute 500 grams or more of methamphetamine and use of a communication facility to facilitate commission of a felony. His criminal record contained two previous drug convictions. Thus, the government filed pursuant to 21 U.S.C. a sentence enhancement and after convicted by a jury trial, Mr. Zavala received a mandatory life sentence. Never has there been a time where the protections guaranteed under the Fourth Amendment have such dire consequences as the case against Mr. Zavala. As you're probably familiar, based on reading the briefing, the majority of the case rested upon a confidential source, Mr. Luis Partita. Does that turn, if we start there with this confidential source, he was the sole and only key to this drug transaction? He was, well, there are basically two pieces, there are two primary errors here. One is the lack of probable cause, and of course, if Your Honor's fine, there was no probable cause, then the fruits of the search would be suppressed, which of course were the two pounds of methamphetamine. He was the sole source for the probable cause. I can address that first. So we go back then, and if you're going to use a confidential source, you have to have the basis. You argue the fact that there was failure to corroborate certain things to judge his reliability. Correct. And I was looking through the record and trying to match this up with the briefs, and I found some things that told me maybe you can help me. Okay. It appears that the officer, Pence, was in testimony. It indicated several things. First of all, he talked about the Buchanan transaction, which eventually the confidential source had given information out, and eventually Buchanan was arrested. Yes. And that one sort of proved out. Yes. There was the Rosa transaction, where Rosa, the confidential source said that Rosa was bringing in money, and if you meet her at the airport, she'll have money for me. Yes. It seems, as I read the Rosa transaction, Rosa actually came in, and she actually had the money, but they couldn't pin on the fact that she knew the source of the money. So actually, he was correct in the fact that Rosa was going to bring in the money, but as far as I could see, the reason they didn't prosecute, they couldn't make the case. Am I wrong in that? Well, I would need to actually get the details from – I don't have the record in front of me. But I did not, in my opinion, the only concession that I will give that, in fact, the DEA had, the only proven evidence to support, to corroborate, was the Buchanan, and that was Mr. Buchanan arrived with $8,000 to buy methamphetamine. I did not, and I'd have to again look at the transcript. I apologize. I wasn't the lawyer in the lower court. Yes. But I do not believe that there were – the facts supported corroboration with the Rosa. So you say that the facts do not support the Buchanan? No. No. I will concede Buchanan. Okay. That's the only thing I will concede. Okay. However, so we have the Buchanan. We don't have Rosa, and moreover, we don't have the Mr. – Okay. Let's stop on Rosa. I'm not going to surprise you with the record, but I would tell you that as I read the record, then we can check it later, and you can, too. Officer Pence seems to indicate that Mr. Partita, the C.S., told us she was going to transport money, but she didn't know where it was from, and they just decided not to prosecute. I think the record, and we'll go back and recheck, indicates that she did have the money. She came in. So at least if you want to stretch it out, the confidential source told us Rosa's coming in with money, and it was there. Yes. Now, we'll have to look at that. Let me give you another one. It seems to me, and it troubled me, and I went back, that there were prior transactions that were listed before Rosa, before Buchanan, that the C.S. reported to the authorities after he was arrested. And if you look at the transcript of Pence, it's record 144, he says that this confidential source said he had listed off numerous persons, two or three that we had already arrested, and we knew of him being the supplier to those he named by name. And then he came to Mr. Buchanan, who we also knew currently was not in custody. He said he was supplying him with kilograms of powder cocaine. Now, the way I read that, and I may be wrong, and I haven't tried to integrate the whole thing, but I needed your input, was it sounds like before we got into the actual things, and as they were developing the information who this guy was, the C.S., they knew that he had already been supplying to these other drug dealers. So they not only knew about Buchanan, they not only knew about Rosa, but they knew about these two or three other persons that had already been arrested, and they knew that the C.S. had supplied them with drugs. Now, doesn't this establish a base for the confidence of the type of information that the C.S. knew, i.e., he knew about similar drug deals, and he pointed out the people that they knew about that were doing similar drug deals, and in fact they caught Buchanan doing it. Now, how much more do they have to have in order to have the reliability for the next transaction, which was Zavala? Well, again, in my opinion, the only reliable source was Buchanan. I will go back and look at where you're referring to, Officer Pence. Well, we just found that, and I was worried about it because I'm like you. I'm worried about the fact that they picked this guy up, and he's facing a live sentence, and all of a sudden he gives all this information. Sure. And part of the issue, Your Honor, is each of those officers, each of those agents, and admittedly they have a lot of cases, but each of them seem to have just different testimony as to exactly how things unfolded. For example, where the wallet was, what the information they had was. I mean, again, we know information was provided on Olivera. It was not confirmed. It was not verified. He was not arrested prior to Mr. Zavala. So, again, we don't have any information about, say there were, say, you know, for them to make an allegation that they had received information from Mr. Partita without fleshing it out and really giving the information, it couldn't be verified one way or another. Let me just follow up with Judge Brunetti's question. It seems to be that the fact that he gave them Buchanan, if you will, and they already knew about Buchanan, kind of cuts both ways. What is your take on if he gives them information about somebody that they already know about, is that corroborating information, or is that a way to corroborate his credibility, or does that mean that he's just not an actual source? Well, I would agree with you that it cuts both ways. My position under the case law is that whether they corroborated that he was accurate with Buchanan or whether it was new information, the fact is Buchanan alone was not enough for them to arrest Raul the second he walked out of the car. There was not enough information there. So, okay. So let me just try to understand. If we discount the meth buy where they didn't make it to Pasco, and if we discount the Rosa situation. Yes. Then we're left with Buchanan. Yes. And if he tells them about Buchanan, but they already know about Buchanan because they're actually talking with him and showing him photos, then you're saying that that really isn't enough with a confidential informant to provide sufficient reliability. So what's the best case or argument on that point? Well, we get into the long line of case law from the U.S. Supreme Court regarding the trustworthiness of the informant and the basis of the informant's knowledge. And we have the Angulo-Lopez case, 791 F2D at 1396, which says, A purported showing of probable cause that is lacking in one or both of the two prongs of the Aguilar-Spinelli test may be upheld only if, quote, there is a substantial basis for the finding of probable cause. The trustworthiness of the informant may be established in several ways. If the informant has provided accurate information on past occasions, which, again, I would submit we have only one here. When the informant provided in the – when information provided in the past involved the same type of criminal activity as the current case, and, of course, that is the case here. And veracity may also be established through admissions against penal interest. I mean, I think one has to look at who the CS is here. We have an illegal alien who has two prior drug crimes. He is facing a life sentence. He's already provided information to the police. I do cite a case in here which discusses the reality that sort of in any information there's truth mixed with untruth. And so it was all based upon, again, that one action, and that was the arrest of Buchanan. I mean, the officers could have done a Terry stop. They could have done a lot of things other than grab Mr. Izvala. And, again, the testimony contradicts. Did they throw him to the ground? What did they do? But the fact is they conceded the second he got out of that car, they grabbed him, and he was under arrest. And that arrest was based only on what Mr. Buchanan said. I mean, you look at the tapes. The officers did not listen to those tapes before the arrest. The conversation was in Spanish. Kagan. They couldn't speak Spanish. I thought they couldn't really understand what was going on. They were walking in and out of the room, you know, and even the interpreter had a hard time, frankly, with the tapes. And, of course, that's another problem, the interpreter testifying to what these tapes mean. I mean, that — I'd like to get to that in a moment. Let me pursue a variation on Judge Bonetti's point. What we're trying to figure out, or what the police are trying to figure out, and then, therefore, we're trying to figure out, is how reliable is the information they're getting from Partita. And reliability could be established by he gave them a successful prosecution, which he basically did with Buchanan. But you can also establish it by he gave them accurate information. And so when he gives them accurate information, Rose is going to show up with money, and she does. When he gives them accurate information, he gave some names, but we knew about them. He's giving accurate information. And we don't know whether it was accurate information about Olivera because they show up at PASCO too late. Correct. Now, there are alternative explanations. Partita may be worried that, okay, so if he succeeds in avoiding the life sentence and he's given up lots of people, they may kill him. I mean, so, I mean, he's going to have some mixed motives here. Maybe he gives up people that he knows already are in their database, but for some reason he's got it in for Mr. Zavala, who's a rival. I mean. Yes. Yes, I would agree. We've got all kinds of things going on here, and it's, I think, a little too simple for us simply to say, well, the only thing we've got that helps us with is the reliability is that he gave up Buchanan. Sure. Well, and, of course, we know that this is, this would not be relevant to the probable cause analysis. We know during the trial, I mean, this is relevant to the Rule 2029 motion. We know that during Mr. Partita's testimony, he says, oh, no, she was just coming up to visit. They take a sidebar. They take the jury out, and the judge, because the defense counsel says, oh, by the way, he's testifying. You know, the only witness against Mr. Zavala is changing his testimony from the one he provided at the suppression hearing, and that was she actually came up to do business or bring money. And the court had to say, now, Mr. Partita, you have to tell the whole truth here, basically accepting the fact that he had lied. Now, of course, nobody knew that prior to the, you know, at the time of probable cause. But, I mean, again, I would submit that given the circumstances, all the officers, the EA agent, needed to do was get a last name, try and run an identification. I understand that argument. I want to close this. I don't want to lose this because you're right on it. The case of Arguello-Lopez, our 1986 case, I think is very important, and I'll read it. It's very short. An informant's veracity or truthfulness may be established in a number of ways. If the informant has provided accurate information on past occasion, he may be presumed trustworthy on subsequent occasions. When the information provided in the past involved the same type of criminal activity as the current information, the inference of trustworthy is even stronger. Veracity may be also established through admissions against penal interest. It seems that passage I was trying to work out about his prior information to them with regard to drug transactions that they'd already erected people, I don't know how that all fits, but it seems to fit in that. He made admissions against penal interest. He gave them information about past drug deals where they're similar. So somehow we have some law and factuary to put together, but we're looking where instead of just concentrating on Rosa and Buchanan, it seems like we have a little broader picture. And I would submit to you, Your Honor, that under the Angulo Lopez, the test emphasizes both the trustworthiness of the informant and the basis of the informant's knowledge. And so I would say trustworthiness might, you know, I mean, yes, they're somewhat similar, but I guess focusing on the basis of his knowledge. Well, with respect to Raul Zavala, what was the basis for his knowledge? There wasn't much there. It was he had allegedly purchased from Mr. Zavala in the past. As far as the officers having probable cause, it was he had purchased from Mr. Zavala in the past. Of course, they didn't know Raul's last name. They didn't know if he had a criminal history. Moreover, the car he was driving wasn't even his, so they knew nothing about him other than this one individual had sold drugs in the past. Could we move to the Spanish transcript? Sure. Because I don't want you to run out of time on that. Okay. It is troubling that, as I understand it, the linguist was called to testify about the meaning of certain words. And she says words like morata and somorra, those kind of words, and girl-related words actually means drugs. It seems that there are, I could find two places in the transcript that are somewhat troubling, where she talks about saying, well, every single title three wiretap, it ends up the same. But that was her response to a general question, and then there wasn't an objection or a move to strike that testimony. And then there's another one where the government says, well, was it obvious to you what's going on in this case? And then things start to unravel and they stop it. Are there other instances where you think the testimony went beyond a linguistic expertise? No. It was those two that Your Honor alluded to. But again, as I pointed out in the brief, the jury, before they voted on guilty, asked for a copy of the transcription of the tape. So clearly it was something important to them. The judge responded, you need to listen to the tapes as well as look at them. Did they ever get a transcript? They did. They did get a transcript. Yes. They both got the transcript as well as they were. The Court just said you need to do both. But I would encourage that you look at these transcripts. They're very innocuous. I mean, again, you know, we have, it's very, first of all, we have testimony that it was unintelligible. And this was, of course, one of the issues I raised was ineffective system of counsel, because the fact is, at this pressure hearing, it was referenced that a defendant's attorney had asked his own interpreter to try and interpret these, and he couldn't. It was unintelligible. So then we have Ms. Amaya twice, or looking at the, listening to these a couple times, you know, and so we come up with these. There are four tapes here, and they're very innocuous. And I think there's a mention of a girl once. And frankly, I could take it as he was hanging out with some girls. Could you give me the page number and the excerpts for those? Oh, sure.  We are 7. It starts at 789. And the reference to the girl is on. It's not that it's just one use of the term girl. Okay, here we go. On page 793, year 793, the translation states, hello, hey, big man, what happened, where are you, I'm here headed home, yeah, what happened, well, with the girls? Well, I understand. Let's give you that. Why is that harmless? Because he testifies on the stand what girls means in the transcript. So do the officers. I mean, there's more testimony than just the interpreter, because if you want to interpreters, a question of expertise with regard to girls, the idea of using code words, and for instance, in this case, because we have a transcript, the idea that girls is mentioned in the code word is not a mystery. Well, here's why it's harmless, because assuming, well, first of all, Mr. Partita clearly has, is biased. He has reasons for providing testimony. But that's up for the jury to decide. The jury has evidence other than this particular interpreter. So why isn't it harmless? Because most of it was from Mr. Partita, who they may have not liked, and that transcript may have been the deciding factor for them. We know the officers have their reasons. Well, the transcript's not going to say girls means drugs. It was the admission of Ms. Amaya's expert testimony, even though she had not been admitted as an expert. It's not the tapes themselves. It was Ms. Amaya's interpretation of. In fact, I think, well, the transcript would not have been nearly as problematic had Ms. In fact, it wouldn't have been problematic had Ms. Amaya not interpreted it. We have, I think the pen said something about rotas being a word. But was that a word in the transcript also? No. So that, his testimony on that, does it match up with the transcript? I don't believe so, no. Okay. I just think just the more it does. Yeah. So we get all those. So it's got to be the girl word from the translator. Yes. The one that's in the transcript. Yes. Mm-hmm. I thought that the officer said girl in testimony, and also Pardita said girl in transcript, meaning drugs. Right. And, again, the jury, obviously the DEA agents have an interest here, as does Mr. Pershing. I hope so. I mean, if they don't have an interest, we're in trouble. But that's for the jury to sort out, isn't it? Yes. And had they not, maybe this last person, this person who was held out as an expert, the person who was hired to merely translate, had she not gone above and beyond and said, oh, and by the way, I can tell you in my experience of having done this this many years. All you're saying is that we can't view harmless error with regard to her testimony. Right. All right. And she's – there was no – basically the government offered her up as a translator. Is that correct? Absolutely. Was there any objection to that? No. Okay. But there was objection when she started talking about, well, this is what these words mean in the sense of this is code. Yes. Yes, there was. Thank you. Thank you. Good morning, Your Honor. May it please the Court? Good morning. My name is Ani Ahmed. I represent the United States in this case. In this case, the district court properly denied the motion to suppress, and it recognized that the officers collectively had the knowledge to support the possible cause finding of the defendant's arrest in the search of his vehicle. The court also used the standards set up in the United States v. Bishop by finding that based on the totality of circumstances, the confidential form and the confidential source provided sufficiently reliable information. This was on certain factors, and the court recognizes in its decision denying the motion to suppress. First, the court recognized that Mr. Pardita was a drug dealer. In fact, he was found with four kilograms of cocaine in his residence, and approximately $60,000 also was recovered. The court recognized that he was familiar with other drug dealers of equal, higher, and lower levels. There was testimony from Officer Pence that Mr. Pardita cooperated on an investigation occurring in the Los Angeles area, that he also cooperated on Mr. Buchanan's case and Mr. Oliveira's case. There was testimony from Officer Pence indicating there was a lot to say about whether that drug deal was successful with Mr. Oliveira. I believe Officer Pence testified that a drug transaction had been set up, that there were recorded phone calls made to Mr. Oliveira, that they arrived in, I believe, in Kennewick is where he lived, at a late time, and that there was a discussion whether they could enter the house. Certain constitutional issues came up, and Officer Pence said that we were concerned that Mr. Pardita was entering Mr. Oliveira's house with fake cocaine. We could not give him real cocaine, and if Mr. Oliveira discovered it was fake cocaine, we would have a problem, and we could not create the exigency to enter that house. So he said that was why the deal was not completed. But that did not take away from the fact that Officer Pence had this information, that he was aware of Mr. Buchanan's activities prior to this, that a reverse purchase was set up with Mr. Buchanan, and most importantly, that the court recognized, the district court recognizes there's no incentive to lie by Mr. Pardita at this point. He's been caught with a lot of cocaine. He's looking at a great deal of time in prison if he's convicted, and he has really no incentive to lie, which is really the same thing that the court looked at in U.S. v. Bishop. The district court also recognized that when the purchase with the defendant, Mr. Zavala, was set up in this case, there was an exact description right down to the spinners on the vehicle. He said he'd be driving a pearl white Escalade. He gave a physical description of Mr. Zavala, and when the officers arrived in the scene, specifically Officer Mary, says he's driving down the road, he sees a pearl white Escalade. He sees an Hispanic individual driving that Escalade. He follows it. It's white spinners. And the parking lot that they were supposed to meet at, Your Honors, was not a big Walmart parking lot. It was a small parking lot off Sharp Street, and I believe Agent Cummings testified that there was five spaces in that parking lot. So a very specific time, very specific location. All of this is that his physical description matched the physical description given by Mr. Pardita beyond the fact that he's Hispanic. That is to say the description is very specific in addition to specific. Chubby cheeks, pot belly. Exactly. In fact, Officer Cummings or Agent Cummings testified that he gave a description that he kind of looked like me. And I understand Your Honors wasn't there, but Officer Cummings, the evidence was, I mean, he certainly is about 5'6", 5'7", physically met the stature of Mr. Zavala, had a pot belly, as indicated. And although it was testified to at trial that Mr. Zavala had lost a lot of weight, Officer Pence and Officer Marion both testified that he did have a pot belly at the time of his arrest. So they did, it was an exact physical description match. You know, when I read the district judge's decision, excuse me, the decision, I think I've got the passage. He indicates that in all instances referenced by law enforcement, the informant supplied by the information, excuse me, supplied by the confidential informant appeared to be accurate and was to the extent capable of corroboration concerned by observation of the participating officers. Now, that's a good conclusion, and then he goes through some examples. But he doesn't explicitly go through all the examples, and so now what standard of review do we do? Now, we're going to go back and review De Novo? That is correct. Okay. So we're going to go back and review De Novo and see if the conclusion, forget about what the judge said, because he's a little shy, very frankly, on his examples about if we're going to use our law and determine whether this confidential source was reliable. Did I misrepresent or did I misinterpret what I saw on the record with regard to when the confidential source, Pardita, was arrested? He related to other drug transactions that he was saying I can give up this guy, this guy, and this guy. And as I read Pence's testimony, he said we already knew about them and they'd been arrested, and we already knew that that confidential source, Pardita, sold drugs to them. Am I wrong? Did I misread that? Sold drugs to who, Your Honor? Sold drugs to these other parties that the authorities had already arrested. Let me back up. I want to make sure, because I might be misreading what I'm reading in the record. The record seems to indicate when Pence is testifying that when they started to talk to the confidential source, Pardita, to determine his veracity about he wanted to be cooperative, he gives them some names of some people that they can buy drugs from. And what Pence seems to say is we knew about those people already. We've already arrested them. And he also said, and we knew that Pardita sold them the drugs. Now, am I wrong in missing? Yes, Your Honor. Let me tell you what Officer Pence was saying at that time. He's not only talking about Eric Buchanan at that time. And then he goes into Buchanan, but it seems as though he's talking about deals before that that they already knew about. Your Honor, there were other individuals that weren't brought up at trial, but that's what Officer Pence was talking about. There were other individuals subsequently arrested due to Mr. Pardita's involvement or cooperation outside of Mr. Zavala, outside of Mr. Buchanan and Olivera. There was individuals that were subsequently arrested due to his cooperation and had been previously arrested by Officer Pence. I intended that to mean what he was trying to say, that the knowledge base with regard to Pardita and drug transaction was broader than just Rosa and Buchanan. But we don't have it. Where's the evidence of it? Well, Your Honor, I mean, it's one thing to say he had brought up Pardita. But it seemed to me that we have to benchmark it against Rosa, Olivera, and Buchanan. Correct? What's in the record, yes. And that's all we have in the record. That is correct, Your Honor. Okay. You're going to abandon what Spence said in the record, then, that there were other transactions which they knew about that Pardita was part of. And you don't think that's part of the record? Your Honor, I'm not going to abandon that, but I'm not going to mention specific  I mean, we know who was arrested subsequently, but they were never brought up in the record. I mean, Pence does say that we did, and I said that previously to the Court, that we did know about other drug activity. We did arrest those individuals. Previously, I'm familiar with those individuals, is what I'll say. I'm going back to our law and application of our law. When we're trying to determine the veracity and the truthfulness of the CS so that we can determine whether you could rely upon them in meeting with counsel's arguments, do we consider, without reference to names, this background that supposedly is in the record? Yes, Your Honor. You should consider that. It should be based on the totality of the circumstances, whether the confidential source was sufficiently reliable, and how do you determine that is what kind of information he's provided in the past, what kind of information he's providing currently, and how it was corroborated. Yeah. He's provided no information prior to his arrest in the time he knows he's facing life in prison, correct? Correct. But he did provide information. Okay. So what we're talking about, this relatively short period. That's correct. And he starts to talk, and this is now Pence describing what he says, and I'm not just reading Pence. We initially threw no names out to the CS. He had listed off numerous persons, two or three that we had already arrested, and we know of him being a supplier to who he named by name. Okay. So this is really the focus of this colloquy between you and Judge Brunetti. So what are we to make of that? If he's the supplier of these people and they have been arrested, it's a fair interest that he knows of their arrest. So he's giving, at that point, he's giving up names that are, in a sense, harmless to him because, well, they've already been arrested. He's not giving them up. So I don't know whether that adds to his credibility or just says he's trying to get off cheap. Well, Your Honor, I think, well — And then when they kind of nod their head and say, yeah, yeah, yeah, forget it, that doesn't help, he finally gives them Buchanan. Well, Your Honor — I'm not sure what to make of this. Right. And I do want to correct that. Officer Pence is talking about people who have been previously arrested. The only person that was arrested with Mr. Pardita at that point was Mr. Zavala, his runner, Zavala, no connection to the defendant. So it wasn't as if he was just making up names or giving names that he knew that people had already been arrested. These are people that had been previously arrested by Officer Pence. He'd been familiar with these individuals, and those people were eventually arrested, but other individuals were arrested again. So these are individuals that Mr. Pence had contact with previously. Well — Right. But the point is this. It's like saying — it's like him saying, well, my address is 61111. Big deal. We already — we know that. I mean, this is not any indicia of your reliability because you were involved in a drug transaction, and you're telling us these guys were arrested, and here's their names. Right. So the real question — I mean, you wouldn't — I think that would be a pretty thin probable cause affidavit if that were — when the judge was saying what people and what circumstances. He already gave us those — he gave us names that we already knew and that he knew we already knew. Oh, well, thanks a lot. Right. But there was — there was information in addition to that, too. And what information are you now referring to? Well, Your Honor, I'm talking about — Is it in the record? It is, Your Honor. Where? I'm talking about Mr. Buchanan and Mr. Oliveira. Oh, and Snowden. Oh, sure, sure. And obviously other individuals. But now we're back to the very specific cases of Rosa, Buchanan, Oliveira. Correct, Your Honor. And Rosa, he says, she's coming with some money for me. They pick her up at the airport. Do we know how much money she had on her? I don't believe it was in the record. All we know is that they didn't find enough — anything to charge her. That's correct, Your Honor. So what do we know other than that she came to the airport and they didn't charge her? Your Honor, it came out during trial that she was also picking up money to take back to Los Angeles area. But that doesn't matter. That wasn't — What did they know at the time they act on his tip about Zavala about Rosa? Very little, Your Honor. Had they picked up Rosa by that time? They had, Your Honor. And they decided not to charge her at that time. That is correct. So all they knew was that Rosa shows up on an airplane. Correct, Your Honor. Okay. They get Buchanan. That proves out. Right. They don't get Olivera because I'm not quite sure what you're talking about with all this house stuff in Kennewick. I understood there was something supposed to happen in Pasco and they don't get there in time. That is correct, Your Honor. He lives — I believe he did live in — Who's he? Mr. Olivera. Lives in where? Kennewick, Your Honor. In Kennewick. They were headed towards that — Was it set up in Pasco? Your Honor, I believe it was initially set up at his — in Pasco. Mr. Olivera wanted to meet at his residence. It was changed to Kennewick. They didn't arrive there until, well, late in the evening. Mr. Olivera at that point had left the residence. There was some indication that Mr. Olivera wanted to meet in the residence. And there was concern by Officer Pence that if they sent Mr. Pardita in with fake cocaine, something might happen. Mr. Olivera might react, might find out it's fake. So what does that show other than — I mean, what can you make of that other than nothing? It didn't — I mean, nothing happened. I mean, there was a guy named Mr. Olivera, correct? Correct. And based on the events of that evening that he was tipped off to, what does that show as to Mr. Pardita's credibility? Well, number one is there were phone calls made both to Mr. Buchanan and Mr. Olivera that substantiated the fact that both these individuals were involved in drug dealing. I mean, there was a — With phone calls to Mr. Olivera in Spanish? Yes, Your Honor. They were made. And who was listening to these phone calls in Spanish? Same guys who don't understand Spanish? Well, Your Honor, I would dispute that. I would respect the — No, I'm asking you the question. I'm not giving you a fact. Yes, Your Honor. That is true. Officer Pence and Special Agent Cummings were listening to phone calls. But Special Agent Cummings testified that he did have a workable knowledge of Spanish. And Officer Pence, as the record indicates, he's cross-examined by defense counsel about his workable knowledge of Spanish. And then defense counsel asked him, what does this Spanish word mean? And so on. And he's able to correctly respond to defense counsel. So every time Mr. Pardita participated in a phone call, he was debriefed by the officers, okay, what occurred, what happened, and so on. Now, whether it's in Spanish or not, whether it's in English, and Mr. Pardita says, okay, he's going to be driving a pro-white Escalade. No, I'm not asking about that. I'm on Oliveira. Oliveira. So you say there's some phone calls back and forth with Oliveira. And are those phone calls in Spanish is what I asked you? That is correct, Your Honor. And the officers who are overhearing them are the same officers who are overhearing the conversations that Pardita is having with Zavala? Correct, Your Honor. And we understand how well or not well they understand Spanish. Yes, Your Honor. So Oliveira just kind of doesn't pan out. It may be true, it may not be true. We don't know. Well, Oliveira is arrested, Your Honor. When? Not before Zavala. He is arrested. When? Prior to, I believe, prior to Mr. Zavala being arrested. You say, I believe. What's the basis for your belief? Well, Your Honor, I can't remember if it's specifically stated in the record, but Mr. Oliveira, the buy doesn't occur. They go back to Spokane, and he is arrested approximately two to three days later. But you see, we're talking about a 48-hour period of the credibility of the confidential informant, and then Mr. Zavala goes down. So hours make a difference. Right. Where in the record would we find when Mr. Oliveira was arrested? To the best of my recollection, Your Honor, I don't think it specifically states in the record. You're getting a little squirrely on me here. Well, that's not my intention, Your Honor. But no, but if you're telling me he was arrested, and then you tell me, well, it was a few days later, that's not relevant. Well, Your Honor, I believe they had the probable cause at that point to arrest him. We're trying to figure out, at the time they act on the tip with respect to Zavala, what did they know about the reliability? And the fact that they arrest him two days later is neither here nor there. So when you say they arrested him, you better tell me that they didn't arrest him until later. Well, they didn't, Your Honor. As I indicated, I don't believe they arrested him for a couple of days. I believe they returned to Spokane. Yeah, but you didn't tell me that until I asked you the question when. Well, that wasn't my intention, Your Honor. I wasn't trying to mislead the Court. What I'm trying to indicate is that I think they did. Well, on April 27th, they provided the information about Oliveira, and they did all that. It was on the 28th that Mr. Zavala was arrested, correct? I think it was the 29th. Oh, okay, the 29th. Well, I'm reading the report of investigation. It says April 28th, they conducted a by-bus operation from Raul Zavala. Okay. So that's the day after the PASCO slash Kennewick or whatever. Correct. Transaction didn't occur. To Oliveira's? Right. PASCO, Kennewick. Okay. Okay. I know that they did not arrest him for a couple of days. Okay. So which would have been after they supposedly had probable cause based on the informant to go after Zavala, correct? They didn't arrest him, Your Honor, after Mr. Zavala, based on the record, but I believe that they had the probable cause to arrest Mr. Oliveira at that time. He was eventually arrested for, you know, just basically talking on the telephone about a drug transaction, and they had the probable cause at that point when they had made the telephone calls to him prior to his arrest. And do you have that in the record? That is on the record, Your Honor. I believe it's in Officer Pence's direct testimony. I don't have the SDR number in front of me, but I can certainly find it. Okay. Officer Pence talks about it in his direct testimony. What's the transcript record number? Excuse me, Your Honor? Are you looking at the transcript? I am, Your Honor. Actually, I'm looking at my brief to try to find out where Officer Pence exactly talked about Mr. Oliveira, and I don't know if I can find it that quickly. But it is – Let me make a – I think counsel is suggesting, and we might find it at – 174, Your Honor. ER-174. ER-174. Okay. 175. 174. Well, whatever we have here on 175, but you don't corroborate – this is in a cross-examination of Officer Pence. I'm now at the top of 175, but you don't corroborate any of that by finding anything until after Raul Zavara is arrested, correct? That is correct. So when you're setting up a negotiation with Zavala, it's not corroborated or confirmed yet that Oliveira was involved, correct? Detailed – corroborated with the detailed info that he gave, it wasn't confirmed until we did a warrant, which is after the arrest, correct? Correct? So where does that leave us? Is this the testimony you were thinking of, or is there some other testimony? No, Your Honor. I mean, I knew it came up during either direct or cross, but – But that's the testimony you were seeking to find? Yes, Your Honor. Now, it doesn't seem to help you very much. That is to say, at the time they get Zavala, Oliveira is neither here nor there. Well, Your Honor, they already had made the phone calls to Mr. Oliveira prior to going to Mr. Zavala. And at that point, what they believed was that they had set up a drug transaction based on those phone calls. But they didn't corroborate anything about it until later, correct? Pence says that is correct. Okay, Your Honor. They didn't get the search warrant based on the information. It doesn't say search warrant. It says corroborate. And he says correct. It was not corroborated until later. Understood, Your Honor. I'd like to, although your time has expired, I have questions about the Spanish language translator. And it seemed that the text of the tapes is fairly innocuous. So it does seem that the word girls as a code word is significant. If we were to determine that the translator went beyond translation and were actually kind of interstitially giving comments about drug transactions and people entitled to reinvestigations, I assume you would argue, well, in the end, it's harmless. Why would it be harmless in your view? Well, Your Honor, I would first argue it was proper. And second, I would argue it was harmless. I would argue it was proper under standards set out by this Court, U.S. v. Gonzales, which is 365F3656. That's a 2003 case, Your Honor. That, in that, this Court said that translators may, if they're offered as an expert, render an expert opinion, or based on their requisite knowledge, provide the meaning of words as to their contextual meaning. And that's exactly what Ms. Amey did in this case. She was not offered as an expert, but she did say based on her requisite knowledge, based on the fact that she was not offered as an expert. No, Your Honor. I never asked her for her expert testimony. I never asked her to render an opinion. What was she, then, if she wasn't an expert? She was a translator, Your Honor. She was basically translating the Spanish phone calls to English. Right. But it seems to me there's a difference between somebody who takes a transcript and translates Spanish to English and somebody else who says, well, typically in drug transactions, because I've listened to a lot of these being a translator and all these Title III investigations, here's how it goes down. They, you know, use names like Muñeca, Sosomoros, or whatever. So she seems to – that's not a translator. That's an expert, it seems to me, what she was talking about. Why isn't that expert testimony? It seems to me she went beyond her translation role. Right, Your Honor. She did testify as to her requisite knowledge of what the word means in context of how it was played and it was substantiated. But that makes her an expert. I mean, if you ask me what does the word – what does this word mean, is it a slang word? You could say, yes, that word in Spanish might mean dolls or girls. Does it also have a slang meaning in your experience? Yes, sometimes it means drugs. That's a translator. But didn't she go beyond that? Well, Your Honor, she certainly testified based on her specialized knowledge. Which would seem that she would be an expert then, not merely somebody doing a ministerial translation, correct? Right. I mean, in the sense that I did not ask for her opinion, but I did ask her based on her knowledge of what she'd done in the past, what does this word mean? And she did indicate that girls in her Title III investigations usually refers to drug transactions. Counsel, isn't this drug dealing 101? I mean, we see this so many times. Drug dealers, if you will, use code all the time. And she was asked, as I understand it, they didn't take her out of the University of Nevada, who was someone who could barely translate Spanish and say, would you translate a few words? You took her in there because she'd deal before with drug transactions as a translator of transcripts made in drug transactions. She wasn't trying to do a linguistic analysis of the Spanish language. And so when she was put on the stand, as I understand it, drug dealing 101, she used to translate other transcripts than she had in the past. And so they said, when you translate and you run across these words, what do they mean? And so it's a word, it means Spanish, it means girl. Well, what else? You also use it in these transcripts that I've experienced. It means drugs. Now, where does that get into expertise? Isn't this a translator who's doing her job trying to figure out what language means? That is correct. I mean, Your Honor, she's just testifying as to her specialized knowledge and what she already knows. She testified she was a narcotics officer in Nevada for several decades. Then she's an expert. She's not a translator. If I give you a word and I say, what does this mean, you translate it. But if you say, based on my knowledge, and the reason I have this knowledge is because I'm sitting here in drug deals and drug – I mean, I'm doing more than just translating when she's testifying, isn't she? I mean, did you ask the – isn't that where the judge actually said, wait a second, she seems to be going a little far afield here? Your Honor, I would respectfully disagree with the court word view in the sense that I'm not asking for her opinion about something. I'm asking her, based on her knowledge, whether you're a – whether you have that knowledge or not, it's really based on your knowledge. And she does have specialized knowledge, but I'm not asking her opinion. I'm saying, based on what you know, what does that word mean? Put it in context. And I don't believe that would be asking for an expert opinion. And if you were – if – if – the reason you asked her to do that is because the discussion was significant between these two individuals, correct? Correct. And the translation of that word was a material aspect of your case, correct? Correct, Your Honor. So if – if we were to determine that her testimony was improper expert testimony – I'm not saying we will, but I'm just saying if we were to determine that, why wouldn't that be prejudicial? Because, Your Honor, it really would be harmless in the sense because both Mehring and Pence in their direct testimony talk about code words being used by individuals that have been trafficked, narcotics. And both Pence and Mehring specifically mention – I know Pence does – specifically mentions the word girls. Girls are sometimes used for methamphetamine. And so you had substantial evidence outside just this translator's testimony as to what that word was. And the reason that she was asked about it was she's the one who's introducing the transcript. So the jury's got to know, okay, you wrote that transcript. And while the jury certainly heard the tapes and is looking at this transcript, you're the one who wrote this. What does this mean? Okay? And put it in context for us. And that's why she was asked about it. But it was certainly corroborated by other people's testimony, at least two other witnesses. Thank you. Can I ask one question on Olivera? Sure. I didn't get a chance. I'll make sure I want to know about Olivera that I got the right person. Olivera was the drug dealer that was set up, but when they went down to make the buy or the sale, they were late. That's why I didn't. Right. It was all set up. And then if he was arrested later, it was completed later. But there was no completion of whatever was set up because they didn't get him to the show on time. That is correct, Your Honor. As Officer Pence testified, I believe, at the hearing, what he said was that we went down there. There was a constitutional issue that came up. We couldn't create the exigency, and we couldn't get in the house. We waited for a while. He eventually ended up leaving. We couldn't complete the drug deal. Now, tell me if I'm wrong. Somewhere I read the fact that the deal was supposed to he told he was going to leave at 9 o'clock if the deal didn't go down. That is correct. And he left at 9 o'clock, and they observed that. That is correct. They observed him leaving the residence. So, in effect, they went to do the deal, but they couldn't get the deal done because they were worried about sending this guy in, sending this confidential informant with these bogus drugs. It was originally set down. He was going to leave if you don't make it at 9 o'clock. 9 o'clock comes, he leaves. That is correct. In fact, as Officer Cummings testifies, the phone calls are coming from Mr. Oliver while they're driving down there to establish the drug deal. Mr. Oliver tells Mr. Pardita, hey, you better come on, hurry up, or else, you know, this is not going to happen. And he ends up leaving. Did he say 9 o'clock? Did I misread the record? Your Honor, I cannot remember. I don't want to be corrected. Okay. All right. Okay. Thank you. Thank you. We have a little bit extensive, so we'll give you two minutes for rebuttal. Thank you. In rebuttal, I would just point to two points in the record for Your Honors. And I really appreciate it. I know my client really appreciates you taking such time to do a thorough record review because the devil is in the details here. If Your Honors look to page 169 and 170 of the ER, it talks about the cross-examination of Officer Pence. And in this, on the top of page 70, Officer Pence states, based on some statements and debriefing that she gave, we decided at that point it would be better to let her go home. Did she have a prior criminal history? No. So ultimately, my response is, did Rosa corroborate the reliability of Mr. Partita? And that is no. Because, and then on page 144 is the direct of Officer Pence. And, excuse me, that's jumping around. But page 144 is where there is this talk of previous persons who had already been arrested. And I would agree with the Court that, in fact, that provided no, that gave no additional reliability to Mr. Partita because it was easy. He gave nothing. He likely knew that they had already been arrested. So that was a giveaway. So really it comes down to Buchanan, Rosa, and again I would submit on 169 and 170, clearly there was something strange going on. They talked to her and they didn't arrest her and they let her go home. Did she confirm or did she verify his veracity or not? We don't know. It's just not there. So ultimately, at the end of the day, we end up with Mr. Buchanan, and that is it. And I would submit based on that. And I had just one further question. This doesn't really concern Mr. Ahmed. It concerns a motion we received from your client on his own. Yes. He called in a motion for clarification with respect to his earlier request that he have a change of counsel, and we denied that. And so his first question on clarification, I believe, well, what's the status of his lawyer? Will his lawyer show up to argue? And the answer is, yes, you have shown up and you've done an admiral job on behalf of Mr. Zavala. And I think his second question for clarification had to do that he had some points on appeal that he did not feel were incorporated in the brief. Is that correct? Yes. And without going into the details of those, have you communicated with him as to why in your judgment as an experienced lawyer those points didn't warrant incorporation in the brief? As I stated in my declaration responding to Commissioner Shaw, I believe when I also asked for relief, and I will renew my motion to withdraw, in fact, after the hearing today, I am not appointed on the 2255, and that's something that Mr. Zavala will deal with. However, as I stated in my motion, it was very difficult because of the attorney-client privilege in disclosing things. The fact is I had spent numerous hours meeting with Mr. Zavala over here in SeaTac. I live in Spokane. I flew over twice and discussed at great length the issues that he felt were appropriate and those that I felt as a lawyer I could raise. So I had already done that prior to him being transported to California. So, yes, I had. So it seemed to me that his motion, his second part of his motion, as I understood it, was really duplicative of the earlier proceedings, which was the question of what substantively might be included in his appeal. And I guess the third point is simply one that he wanted whoever was his lawyer on this appeal to also be his habeas lawyer, which doesn't, as we know, doesn't always happen. And I would not agree to it. I've accepted the opportunity. I understand. So I would just ask for permission to withdraw as counsel. I don't know if you all would do that at this point. You may renew your motion in writing. Thank you. Thank you. Thank you. I was very impressed with your representation of this client under the circumstances. Thank you. More current than before. And you did an admirable job. I appreciate it. And I thank both counsel, because this is a difficult question. There's a lot of record issues. And we kept you for about an extra 6 to 10 minutes, Mr. Amas. We appreciate your patience on that. And I want to thank both counsel for your argument this morning. The case is submitted. We're going to take a short break. The next case is United States v. Vaux and U.N. My suggestion is this, is that we first argue the Vaux case until you may ‑‑ everybody can come to counsel table, but you can get prepared to argue that case first, and then we'll proceed with the second case. All rise. This court stands in mayhem.
judges: Brunetti, McKeown, W. Fletcher